## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS


**JANICE LARIVIERE,**

**Plaintiff,**

**v.**                                                  **No. 16-1138-DRH**

**BOARD OF TRUSTEES OF SOUTHERN
ILLINOIS UNIVERSITY, PAUL FULIGNI,
DONNA MEYER, and KENNETH NEHER[1],
in their individual capacities as agents of
BOARD OF TRUSTEES OF SOUTHERN
ILLINOIS UNIVERSITY,**

**Defendants.**


## <u>MEMORANDUM and ORDER</u>


**HERNDON, District Judge:**

### <u>Introduction and Background</u>

Pending before the Court is defendants' motion for summary judgment (Docs. 106, 107, 115, & 116).   Plaintiff opposes the motion (Docs. 109, 110, & 111).   Based on the record, the applicable law and the following, the Court rules as follows on the motion.

---

1 On October 20, 2017, defendants filed a suggestion of death as to defendant Kenneth Neher, who passed on October 12, 2017 (Doc. 72).   On May 31, 2018, the Court dismissed with prejudice the claims for punitive damages against the Estate of Kenneth Neher contained in Counts III, IV and V of the fourth amended complaint (Doc. 120).

Please bear with the Court as it attempts to recite the extensive procedural history of this matter. On September 2, 2016, Janice LaRiviere, an African American, filed suit against in Illinois state court alleging unlawful retaliation by the Board of Trustees of Southern Illinois University ("SIU") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (Count I); racial discrimination against SIU in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (Count II); damages against SIU for intentional discrimination pursuant to 42 U.S.C. § 1981a (Count III); intentional infliction of emotional distress ("IIED") against Donna Meyer, Fuligni and Kenneth Neher (Count IV); and negligent infliction of emotional distress ("NIED") against Meyer, Fuligni and Neher (Count V). On October 14, 2016, defendants removed this case from St. Clair County, Illinois Circuit Court to this Court based on federal question jurisdiction, 28 U.S.C. § 1331 (Doc. 1).[2] Thereafter, defendants filed a motion for more definite statement (Doc. 7). On November 21, 2016, after no response from LaRiviere, Magistrate Judge Stephen Williams granted the motion and directed LaRiviere to file an amended complaint that "identifies the capacity in which each Defendant is being sued in Counts 4 and 5, and identifies the specific Defendants who allegedly perpetrated each act alleged in the Complaint." (Doc. 15).

On November 23, 2016, LaRiviere filed a first amended complaint (Doc. 17). The first amended complaint alleges violations of 42 U.S.C. § 2000e-3; Title VII; 42

_____

2 Throughout most, if not all, of this case LaRiviere misspells defendant Fuligni's last name. The current complaint on file contains the incorrect spelling. The correct spelling is "Fuligni." Hence, the Court uses "Fuligni" throughout this Memorandum and Order.

U.S.C. § 1981 against SIU (Count I); violations of 42 U.S.C. § 2000e-2; Title VII; 42 U.S.C. § 1981 (Count II); violations of 42 U.S.C. § 1983 against SIU (Count III); violations of 42 U.S.C. § 1983 against Fuligni, Meyer and Neher (Count IV); intentional infliction of emotional distress against Meyer, Fuligni, and Neher (Count V) and negligent infliction of emotional distress against Fuligni, Meyer and Neher (Count VI).   Thereafter, defendants moved to dismiss LaRiviere's Section 1981, Section 1983 and portions of her Title VII claims in the first amended complaint (Docs. 23 & 24) and defendants filed an answer (Doc. 25).   In response on January 2, 2017, LaRiviere filed a motion for leave to file a second amended complaint (Doc. 30), a memorandum in opposition to the motion to dismiss (Doc. 31) and a second amended complaint (Doc. 32).   On January 3, 2017, the Court granted her leave to file the amended complaint and found as moot the motion to dismiss (Docs. 33 & 34).   Thereafter, the Court granted defendants' partial motion to dismiss Count III (Doc. 39).   Specifically, the Court granted with prejudice the official capacity claims against Fuligni, Meyer and Neher contained in Count III, dismissed without prejudice the remaining claims in Count IIII and allowed LaRiviere up to and including March 22, 2017 to file a third amended complaint.

On March 21, 2017, LaRiviere filed both a motion for leave to file an amended complaint to include a breach of contract claim (Doc. 41) and a third amended complaint (Doc. 42).   Defendants filed an opposition to the motion to amend (Doc. 47) and another motion to dismiss Count III of plaintiff's third amended complaint (Docs. 48 & 49).   On March 30, 2017, the Court granted the

motion to amend, allowed the third amended complaint which contained the breach of contract claim on file to stand and allowed the motion to dismiss Count III on file to stand (Doc. 50). Thereafter, LaRiviere filed a motion for preliminary injunction (Doc. 52), defendants filed an opposition (Doc. 54), and the Court denied the motion for preliminary injunction on June 6, 2017 (Doc. 58). In the meantime and after the Court's denial of the preliminary injunction motion, LaRiviere without leave of the Court filed a fourth amended complaint adding a claim under the Family Medical Leave Act ("FMLA") twice (Docs. 56 & 60), which were stricken by the Court for not having leave of the Court and/or for not having defendants' consent (Doc. 60). LaRiviere also filed another motion for leave to file a fourth amended complaint (Doc. 59). On June 13, 2017, the Court denied defendants' motion to dismiss (Doc. 62) and on June 22, 2017, the Court allowed plaintiff to file a fourth amended complaint to include the claim under the FMLA instanter (Doc. 64).

Almost a month later, LaRiviere filed the fourth amended complaint on July 19, 2017 (Doc. 66). That complaint contains the following claims: 42 U.S.C. § 2000e-3, Title VII, unlawful retaliation, race discrimination and punitive damages against SIU (Counts I and II); unlawful retaliation against Fuligni, Meyer and Neher (Count III), intentional infliction of emotional distress and negligent infliction of emotional distress (Counts IV and V); breach of contract against SIU (Count VI); and violations of the FMLA against SIU (Count VII) (Doc. 66).

As the motion for summary judgment is ripe, the Court turns to address the

merits of the motion.

## <u>Facts</u>[3]

Southern Illinois University is a multi-campus university system with facilities in Carbondale, Springfield, East St. Louis, Alton and Edwardsville, Illinois. The main campus of Southern Illinois University Edwardsville, ("SIUE") is located in Edwardsville, Illinois.

In 2002, LaRiviere began her employment with Southern Illinois University on a "continuing appointment." LaRiviere has a Bachelor's degree in English from Southern Illinois University and a Master's degree in Legal Studies from Webster University. In 2006, she applied for and received the position of Assistant Director of Building Maintenance in the Facilities Management Department of SIUE. SIUE's Facilities Management Department is responsible for, among other things, the design and construction of new facilities and improvements to existing facilities on SIUE's campuses, including SIUE's satellite campuses. Prior to her appointment as Assistant Director of Building Maintenance, LaRiviere had no prior training in maintenance operations or electrical operations. From 2006 through 2011, she worked under the direct supervision of Robert Washburn, the Director of Facilities Management. During this time, Washburn reported to Neher, SIUE's Vice Chancellor for Administration. Neher had no experience working in a university setting prior to becoming employed at SIUE. Neher's duties included

3 The parties do not dispute these facts.

responsibilities for the Facilities Management and Human Resources. Neher had the authority to hire, terminate and reassign employees. LaRiviere maintained a productive and good working relationship with Washburn. As her direct supervisor, Washburn was not a "micro-manager" and largely deferred to LaRiviere with respect to how she performed her job.

In March 2011, LaRiviere became aware that Washburn was planning to retire and indicated that she was interested in his position. Subsequently, LaRiviere learned that Neher intended to "post" Washburn's position publicly and seek outside candidates for the open position. She also learned that the posted position would require an engineering degree, a qualification she did not have. Before SIUE started the hiring process, LaRiviere asked to be appointed directly to Washburn's position. She asked if both the posting requirement and the engineering degree requirement could be waived. Neher refused to waive either the posting requirement or the engineering degree requirement.

At the conclusion of the search process to replace Washburn in 2011, Paul Fuligni was hired as the new Director of Facilities Management. Prior to being hired by SIUE, Fuligni served in the Navy for almost 30 years. Fuligni has a Bachelor's Degree in Civil Engineering from Northwestern University and a Master's Degree in Environmental Engineering from the University of California at Berkley. Fuligni is also a registered Professional Engineer. During his time in the Navy, Fuligni served as Vice Commander of an organization with approximately 4,000 subordinate employees and was a commanding officer of another

organization with 700 subordinate employees. As part of his extensive work history in the Navy, Fuligni had over 10 years of significant managerial expertise dealing with facilities management on multi-building campuses. He never worked in a university setting prior to being hired by SIUE. In 2012, Fuligni became LaRiviere's direct supervisor.

On October 22, 2012, LaRiviere filed a discrimination lawsuit against SIUE and Neher in this District Court, challenging Neher's decision not to waive the posting requirement for Washburn's position. *See LaRiviere v. Board of Trustess of Southern Illinois University*, 12-1126-JPG-SCW. On January 13, 2014, pursuant to the parties' stipulation of dismissal with prejudice, that lawsuit was dismissed. Prior to the dismissal of LaRiviere's first lawsuit, LaRiviere filed a second lawsuit in the St. Clair County, Illinois Circuit Court asserting similar allegations as the first lawsuit. The second lawsuit was dismissed by the St. Clair County, Illinois Circuit Court on August 14, 2014. From 2012-2014, LaRiviere unsuccessfully challenged the decision of SIUE regarding Wasburn's open position.

After Fuligni was hired, he decided to create a new Associate Director position in the Facilities Department. In July 2012, Meyer was hired to fill this new position. Meyer has a Bachelor's Degree in Civil Engineering and previously worked for Missouri-American Water Company for 24 years as its Director of Maintenance, as well as in other supervisory roles. Prior to obtaining the position at SIUE, Meyer had never worked for a university. After Meyer was hired, LaRiviere, along with three other Assistant Directors in the Facilities Management

Department, reported to Meyer.

LaRiviere did not agree with Fuligni's management style. She believed in a "shared governance" type of relationship between supervisors and employees. According to her, Fuligni relied on his military background, and did not utilize the shared governance style preferred by LaRiviere. According to LaRiviere, Fuligni is "an absolutely wonderful leader if you are in the military … [but not where] it's already established, where it's shared governance …" LaRiviere also did not appreciate Meyer's management style. Meyer believed it was productive and effective for her to speak or discuss projects and ideas with the supervisors who worked under LaRiviere. LaRiviere thought such discussions were inappropriate.

A Position Description Questionnaire ("PDQ") is a document that defines an employee's duties and responsibilities. PDQs are prepared by the employee's supervisor with input from the employee. PDQ's are revised and updated periodically and the employee then signs the PDQ acknowledging their responsibilities. In December 2011 and prior to the hiring of Fuligni, LaRiviere signed an updated PDQ while Washburn was her supervisor. In April 2013, LaRiviere's PDQ was updated by her new supervisor, Meyer, to reflect LaRiviere's new reporting structure. The updated PDQ also reflected other associated organizational changes in duties and responsibilities. LaRiviere refused to sign the updated PDQ as she objected to her new supervisor's assignment of duties and responsibilities. After months of discussion and repeated attempts to get LaRiviere to sign the updated PDQ, Meyer gave up, and LaRiviere did not sign the

updated PDQ. Three years later in March/April 2016, Meyer attempted to have LaRiviere sign an updated PDQ. LaRiviere again disagreed with her supervisor's description of her assigned duties. However, LaRiviere signed the new PDQ, adding the language: "signing under duress, duties are not reflective of all responsibilities."

In 2013, LaRiviere was given a directive to issue discipline to Mr. Basden, a laborers' foreman and one of her subordinate employees. In response, LaRiviere sent an email to Meyer stating: "cannot move forward with oral counseling of Don Basden." Eventually, LaRiviere was orally reprimanded for refusing to discipline Mr. Basden as instructed.

LaRiviere has no formal training in electrical operations and prior to assuming her job as Assistant Director, she did not work with electricians. In 2013, SIUE began preparing to assume responsibility from Ameren Illinois for its underground electrical system. During this time, there were a series of meetings to determine whether SIUE's electricians could be deemed as "qualified electrical workers" ("QEW"). At the conclusion of the meetings, Meyer and other members of the management team, believed that SIUE's electricians could be properly deemed as QEW's. LaRiviere disagreed with this assessment. LaRiviere was concerned about the safety of people at SIUE in general and her electricians in particular and she did not want defendants to require them to perform dangerous tasks that they were not qualified for. LaRiviere persisted in her disagreement with Fuligni, Meyer, Dave McDonald, SIUE's Director of Environmental Health and

Safety, Gary Sammons, SIUE's general foreman and certified electrician and Keith Berry, an electrician, who all believed that the SIUE's electricians could be deemed as QEWs. In this meeting, LaRiviere publicly stated that she should receive extra pay for having to meet and collaborate with all of "these people" (referring to the architects).

At times, LaRiviere had a contentious working relationship with her co-workers. At other points, she openly questioned and undermined the decisions of her supervisors. For example, after a subordinate employee requested permission to access SIUE's electronic building access control system for work purposes and after Fuligni approved the request, LaRiviere went to the subordinate employee and told him that she did not agree with Fuligni and that she would not have approved his request.

Fuligni issued an addendum to the department's sick leave policy which defined "Planned/Scheduled" sick leave as sick leave requested at least 2 days before the leave is taken and "Unscheduled" sick leave as leave that is not requested at least 2 days before the leave is taken. The updated sick leave policy applied to everyone in the department. Pursuant to the sick leave addendum, in March 2016, employees were given forms to complete if they wanted to request schedule sick leave. Such forms needed to be completed and submitted 48 hours in advance of the requested leave.

On March 10, 2016, LaRiviere submitted sick leave request forms for every work day between March 15, 2016 and April 1, 2016, stating that she would be out

sick, "subject to change as situation dictates." She also submitted vacation request forms for every work day from March 15, 2016 to April 1, 2016, stating she would be on vacation every day "subject to change as situation dictates." According to LaRiviere, she planned to be at work every day. However, in case she failed to show up she wanted to have her documentation pre-submitted so that no absence could be counted against her.

In the spring of 2016, Fuligni approached Meyer and Neher and both indicated it was time to terminate LaRiviere's appointment. Meyer agreed with Fuligni's decision not to renew LaRiviere's continuing appointment. Meyer did not review SIUE policy 2.13 prior to recommending that LaRiviere's continuing appointment not be renewed. Meyer never placed LaRiviere on a performance improvement plan prior to LaRiviere's continuing appointment not being renewed. Meyer never told LaRiviere in writing that her performance was unsatisfactory prior to LaRiviere's continuing appointment not being renewed. Meyer never offered LaRiviere the opportunity to receive a year of training pursuant to SIUE policy 6.25 prior to LaRiviere's continuing appointment not being renewed. Meyer never warned LaRiviere that she would not recommend that LaRiviere's continuing appointment be renewed if LaRiviere did not improve her performance. Meyer did not give LaRiviere an unfavorable rating in any category during her last performance review. She received satisfactory scores on her last performance review. During the entire time of the purportedly contentious relationship, Meyer gave LaRiviere only one oral reprimand and no written reprimands. There was no

specific instance that ever required LaRiviere to receive a written reprimand. Meyer kept a journal on LaRiviere; however, Meyer never provided the journal to SIUE's Human Resource Department.

On May 5, 2016, LaRiviere was notified in writing that her appointment to her position would end in one year. Her notice specifically stated: "Pursuant to the Personnel Policies Applicable to Professional Staff Employees, this letter serves as your one (1) notice of non-reappointment as the Assistant Director, Facilities Management." The notice also informed her that her employment would end in a year.

Section 2.18 of SIUE's Administrative Professional Staff Procedures Manual is titled "Reorganization or Retrenchment, Layoff, Position Elimination, Non-Renewal or Removal for Cause" and addresses multiple different methods and processes for how SIUE can separate an employee from their administrative professional position. A portion of Section 2.18 relates to dismissals for failure to perform assigned duties. In the case of dismissal for failure to perform duties, SIUE can separate an employee in a more expedited manner, but only after providing the employee with an evaluation documenting the unsatisfactory performance and subsequent opportunities to improve performance. SIUE can also separate an employee by non-renewing their position. In such cases, the employee is entitled to a specified amount of notice depending upon their years of service. Under that section, administrative professional staff employees on continuing appointments for three or more years are required to receive one-year

notice of non-reappointment. LaRiviere had been employed on a continuing appointment for over three years, thus, she was entitled to one-year's notice of the non-renewal of her position. When an employee has a continuing appointment and they are entitled to a one year's notice of the non-renewal of their position, SIUE's standard policy is to convert their continuing appointment to a one-year term appointment. When an employee on a continuing appointment is converted to a term appointment for their final notice period, it is not uncommon for that employee to be moved to another building.

In addition, Fulingi decided to change LaRiviere's job responsibilities during the one year notice period. Despite the change in job responsibilities, LaRiviere kept the same job title, her same benefits, and the same pay.

In 2015, the Facilities Management Department assumed responsibility for the building at 420 University Park Dr. on the SIUE main campus. The 420 University Park building was one of the newer buildings on campus and had chemistry labs, biology labs and office space. In May 2016, the 420 University Park Dr. building was only partially occupied and students were not using the biology and chemistry labs. People worked in an adjacent part of the building. In the fall when classes resumed, students utilized the building for classes several days of the week.

After making the decision to non-renew LaRiviere, Fuligni moved her to a new office during her one-year notice period. On May 9, 2016, she moved into her new office located in the 420 Park University Dr. building. After she moved into

her office, she reported what she perceived to be certain deficiencies. Fuligni did not know what Mr. James was referring to when he wrote that there were heavy bags of "body parts" in LaRiviere's new building. Fuligni sent work crews to check out her concerns and make repairs. LaRiviere's concerns regarding her work space were addressed with 10 days of her complaints with the exception of the HVAC. The HVAC problems were addressed in June 2016.

The building at 420 University Park Drive was described by one of defendants' employees (other than LaRiviere) as "good and lonely." The only refrigerator appeared to have a hazardous matter spilled inside of it and was labeled "Student Sheep Brains." The building had no microwave and the dishwasher was unsafe for use. A plumber was unable to determine why, after a fountain ran for over an hour and a half, the water was still discolored. Also, the humidity was a little higher than it should be in the building. Fuligni was aware that LaRiviere developed an eye infection after she moved into the new building.

LaRiviere's request for an automobile to use in conjunction with University business was denied. LaRiviere's request for a radio to use for her safety and to conduct University business was denied. LaRiviere was not allowed to attend meetings. LaRiviere was not provided any clerical support.

Less than two weeks after SIUE provided the one-year notice of its decision to non-reappoint, LaRiviere submitted paperwork requesting the use of intermittent FMLA leave for 1 to 3 days per week. These requests were granted. The following spring, while still employed on her one-year notice period, LaRiviere

submitted another FMLA request seeking continuous leave from February 23, 2017 through May 5, 2017, her last day of employment. Again, the request was granted.

Upon learning that LaRiviere would be out on FMLA leave through the end of her employment, Fuligni tried to reach her to discuss the administrative steps required for the end of her employment, including returning any SIUE equipment or materials and making sure LaRiviere was able to retrieve all personal items that may have been left in her office. According to LaRiviere, Fulgini called her approximately three times, she spoke to him once briefly and he left her approximately three voicemails, one of which LaRiviere saved. The following is the voicemail message:

> Good morning Janice. This is Paul. Calling to discuss with you the disposition of your office. I got the information from HR confirming that you'll be off through May 5th. So, I would like to talk to you about what we would like to do with the office there. Number here, of course, is 650-2560. Thank you.

Fuligni followed up on his call with a letter to LaRiviere which included a "Departing Employee Checklist" and coordinated a time by which to pick up any personal items left in her office. LaRiviere admitted that she is not alleging that Neher, Meyer or any other individual at SIUE besides Fuligni interfered with her FMLA leave during her employment with SIUE.

During the past five years, SIUE's Facilities Management Department only had two African American administrative professional staff employees who were subject to a continuing employment. Also during the past five years, SIUE's

Facilities Management Department only had two African American administrative professional staff employees. The only other African American administrative professional staff employee in SIU's Facilities Management Department had been on the job for less than one a year.

Eventually, defendants replaced LaRiviere with a white male who had not earned a college degree and who had worked at SIUE for less than one half the time of LaRiviere.

## Summary Judgment

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving

party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (alteration in original) (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001)(citation omitted).

## **Analysis**

## **Count II - Title VII and 1981 race claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1981 makes it unlawful for an employer to discriminate on the basis of race or national origin when "mak[ing] and enforc[ing] contracts." 42 U.S.C. § 1981.

A plaintiff may prove discrimination under Title VII either directly or indirectly.[4]  A plaintiff proceeds under the direct method of proof by showing "either direct or circumstantial evidence of intentional racial discrimination." *Tank v. T–Mobile, USA, Inc.,* 758 F.3d 800, 805 (7th Cir. 2014).  Direct evidence includes actual admission of discriminatory intent. *Mullin v. Temco Mach., Inc.,* 732 F.3d 772, 776 (7th Cir. 2013). Circumstantial evidence includes:

> (1) a mosaic of evidence which, taken together, would permit a jury to infer discriminatory intent; (2) comparative evidence showing that employees similarly situated to the plaintiff other than in the protected characteristic received systematically better treatment; and (3) pretext evidence, where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief.

---

4  The analytical framework is "essentially identical," and therefore the Court need not analyze them separately.  *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1104 n. 1 (7th Cir. 2012)(discussing Title VII and § 1981).

*Piraino v. Int'l Orientation Res., Inc.,* 84 F.3d 270, 274 (7th Cir. 1996); *see also*

*Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 527 (7th Cir. 2008). Courts do not

employ "some kind of esoteric 'mosaic test' or theory" under the direct method of

proof. *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir. 2013). The circumstantial

evidence, taken together, "must point directly to a discriminatory reason for the

employer's action." *Adams v. Wal–Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.

2003). "[A]n overload of irrelevant or nonprobative facts," will not "add up to

relevant evidence of discriminatory intent.... [Z]ero plus zero is zero." *Gorence v.

Eagle Food Ctrs., Inc.,* 242 F.3d 759, 763 (7th Cir. 2001). Similarly, a single piece

of circumstantial evidence, without more, will not support a case of illegal

discrimination. *Hobgood v. Illinois Gaming Bd.,* 731 F.3d 635, 644 (7th Cir.

2013).

Under the indirect method of proof, a plaintiff employs the test articulated in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973). A plaintiff has the initial burden to show that: (1) she is a member of a

protected class; (2) she was meeting her employer's legitimate expectations; (3) she

was subject to an adverse employment action; and (4) similarly situated employees

who were not members of the protected class were treated more favorably.

*Andrews v. CBOCS W., Inc.,* 743 F.3d 230, 234 (7th Cir. 2014). If a plaintiff

establishes a prima facie case, the burden shifts to the defendants to "articulate a

legitimate, nondiscriminatory reason for the adverse employment action, at which

point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pre-textual." *Id.*

LaRiviere has not specified whether she is proceeding under the direct or indirect method of proof. Her brief in this section does not set out the standards for either method. Instead she responds that there remain genuine and material questions regarding whether SIUE discriminated against her when it terminated her continuing appointment and changed her terms and conditions of her employment before she was discharged. The Seventh Circuit emphasize that "all relevant direct *and* circumstantial evidence is considered (in its 'totality') in *both* methods," but that "we do indeed consider the 'direct' and 'indirect' methods separately when reviewing summary judgment." *Orton–Bell v. Indiana,* 759 F.3d 768, 773 (7th Cir .2014) (emphases in original). When "a plaintiff eschews burden-shifting and presents direct and circumstantial evidence in opposition to an employer's motion for summary judgment," courts typically use the direct method as the "default rule." *Morgan,* 724 F.3d at 997..

Here, the Court finds that LaRiviere's claim fails under both methods. The record is devoid of any direct evidence of discrimination. In fact, LaRiviere admits that Neher, Fuligni and Meyer never made any racially derogatory comments to her. Further, LaRiviere has not demonstrated that Neher, Fuligni and Meyer made racially derogatory comments to others. LaRiviere submits that there is sufficient circumstantial evidence to permit a jury to conclude reasonably that she was terminated on the basis of race because she was the only African American in her

department at the relevant time.   LaRiviere also contends that SIUE's alleged false statements that she cannot play nice with others can constitute relevant evidence of an illegal employment practice with employment actions that are adverse employment actions under the law.   Viewing the facts most favorable to LaRiviere as the Court must, the Court concludes that she failed in her burden to provide any evidence of racial discrimination under the direct method.

Likewise, the Court finds that LaRiviere cannot establish a prima facie case under the indirect method as she cannot establish that similarly situated employees who were not in the protected class were treated more favorably.[5]   As evident in her pleadings, LaRiviere failed to identify any similarly situated employees outside her protected class who was treated more favorably. The record does not contain evidence of any Caucasian SIUE managerial employee in LaRivier's department who reported to Fuligni or Meyer that were treated more favorably.   The failure to identify and the lack thereof of such a similarly situated employee in the record is fatal to her race claim.   An assertion that "there is no evidence that anyone else was terminated at this time but [me]" does not pass muster.   *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938-39 (7th Cir. 2007)(Seventh Circuit concluded that type of assertion did not satisfy plaintiff's burden to identify and produce evidence of a similarly situated employees whom the employer treated differently.).

---

[5] Defendants concede element 1- she is a member of a protected class and defendants concede element 3 – she suffered an adverse employment action.   However, defendants maintain that she cannot establish element 2 – she was meeting her employer's legitimate expectations and that she cannot establish element 4- similarly situated employees outside the protected class were treated more favorably.

Clearly, LaRiviere has not established a prima facie case of race discrimination and her claim fails.

**Counts I and III – Title VII and Section 1981 retaliation claims**

Title VII makes it unlawful "for an employer to discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Retaliation is also cognizable under a § 1981. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 398 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)(citing 42 U.S.C. § 1981). Retaliation, like discrimination, can be established under the direct or indirect method of proof. *Coleman*, 667 F.3d at 859. LaRiviere cannot establish a retaliation claim under the indirect method because she fails to present any similarly situated employees who were treated more favorably. *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 694 (7th Cir. 2014).[6] Therefore, she must proceed under the direct method of proof and show: (1) she engaged in protective activity; (2) that defendants took an adverse employment action against her; and (3) there was a causal link between the two. *Tank*, 758 F.3d at 807.

Here, defendants concede that plaintiff established both elements 1 and 2. As to element 1, defendants concede that LaRiviere engaged in protected activity when she initiated her prior lawsuits against SIUE in 2012 and 2013 and as to element 2, defendants concede that LaRiviere suffered an adverse employment

---

6 She merely states that "[s]imilarly situated white employees were not treated as shabbily as Plaintiff. No white employees lost his or her position as a result of the purported reorganization. And none of the other white managers in Facilities Management was ostracized and forced to join Plaintiff in the notorious building 420." (Doc. 111, p. 7).

action when SIUE decided to terminate her position in May 2016. However, defendants maintain that LaRiviere cannot establish element 3, the causal connection between her protected activity and her adverse employment action and thus her claim fails as a matter of law. In response to this portion of the summary judgment motion, LaRiviere states:

> Plaintiff was able to survive until she started standing up for her rights and filing lawsuits against Defendants. She had also never been suspended/terminated or reassigned to a remote area of the campus before she began in her protected activity. The suspicious timing alone may not support a reasonable inference of retaliation. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). However, together with other facts, suspicious timing can sometimes raise an inference of a causal connection. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008).
> The Courts phrase the retaliation standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. In our case, after Plaintiff filed his Charges he was told by Peter Terinzio, one of Defendant's Senior Human Resource Managers that the company felt that Plaintiff could not be objective in his investigations. *Exhibit Five, Fred Carpenter Deposition Transcript*, page 169, line 4-24.
> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words or the physical acts performed. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). In other words, the genuine issues of material fact regarding, when, why and how Plaintiff was retaliated against precludes granting a summary judgment."

(Doc. 111, ps. 5-6).

The Court agrees with defendants that LaRiviere's arguments against retaliation are devoid of any factual support. Clearly, paragraph 2 of LaRiviere's response was a "cut and paste" error from another document in another litigation. Nowhere in the record of this case are there people named Peter Terinzio and Fred

Carpenter. Further, there is no direct evidence that any action by SIUE, Meyer, Fuligni or Neher were, in any way, motivated by the filing of her previous lawsuits. LaRiviere does not have any evidence of statements by Meyer, Fuligni or Neher that would permit even the slightest reference of retaliatory motive based upon the filing of her previous lawsuits.

Moreover, there is no evidence of a causal link. LaRiviere engaged in protected activity when she originated her prior lawsuits against SIUE and Neher in 2012 and 2014 (and the end of appeal of the second lawsuit was in July 2015). The second lawsuit was resolved completely *ten months before* LaRiviere's notice of termination in May 2016. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 613 (7th Cir. 2001)(Seventh Circuit determined "for there to exist a telling temporal sequence, the employer's adverse action should follow 'fairly soon after the employee's protected expression.'"); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998)(holding a gap of more than six months cannot establish a causal connection); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2002)(six months too long to establish casual connection); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002)(without more, three months insufficient); *Argyropolous v. City of Alton*, 539 F.3d 724, 728 (7th Cir. 2008)("seven-week interval between [Plaintiff's] complaint and her subsequent arrest/termination does not represent the rare case where suspicious timing, without more, will carry the day."). Thus, LaRiviere fails to establish a prima facie case of retaliation.

<u>**Count IV – Intentional Infliction of Emotional Distress**</u>

To state a claim for IIED, LaRiviere must show that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress; and (3) the defendant's conduct did cause severe emotional distress." *Naeem*, 444 F.3d at 605. Illinois courts have required a "heightened level of egregiousness" and conduct that has been "outrageous" and "extreme" to maintain an IIED claim. "IIED requires more than 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *McGrath,*127 Ill.Dec. 724, 533 N.E.2d at 809 (citation and internal quotation marks omitted).

Under Illinois law, a defendant's conduct must be such that the "'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim: Outrageous!'" *Doe v. Calumet City*, 641 N.E.2d at 507 (*quoting* Restatement (Second) of Torts § 46 cmt. D (1965)). In *McGrath*, the Supreme Court of Illinois cited non-exclusive factors which can help inform this rather fluid standard. *See McGrath*, 533 N.E.2d at 809–10. One factor that influences the extreme and outrageous nature of the conduct is the degree of power or authority that the actor has over the plaintiff. *Id.*

In the employment context, Illinois courts are hesitant to conclude that conduct is extreme and outrageous unless an "employer clearly abuses the power it

holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Richards*, 869 F.3d at 567 (quoting *Naeem*, 444 F.3d at 605). The fear is that, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 605 (quoting *Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 746 (1st Dist. 2000)).

Defendants argue that LaRiviere's IIED claims fail as a matter of law as she cannot establish any of the elements. Specifically. Defendants contend that the behavior about which she complains does not come even remotely close to approaching the level of severity necessary to establish an IIED claim under Illinois law. Defendants contend that their alleged conduct simply does not constitute the type of extreme and outrageous behavior that no reasonable person should have to endure. In response to this argument, LaRiviere basically lists "facts" she thinks supports her claim. (Doc. 111, p. 10). Her facts are in a list form without case law and do not state how or why these facts create genuine issue of material facts under this claim. After viewing the evidence in the light most favorable to LaRiviere, the Court agrees with defendants. There is no evidence that defendants were using their powers to threaten or intimidate LaRiviere. The Court concludes that the conduct of Neher, Fuligni and Meyer was not "beyond all possible bounds of

decency" and would not rouse and average community member to scream "Outrageous!"   Thus, LaRiviere's IIED claims as a matter of law.

**Count V – Negligent Infliction of Emotional Distress**

The tort of NIED is related to intentional infliction of emotional distress, but it is based on negligence. To prevail on an NIED claim, the plaintiff must show the existence of a duty owed by the defendant to the plaintiff, the defendant's breach of that duty and an injury proximately resulting from that breach. *Corgan v. Muehling*, 574 N.E.2d 602, 606 (Ill. 1991) (quoting *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill.2d 507, 525).

Illinois law imposes different standards for "direct" and "bystander" victims of negligent infliction of emotional distress. Direct victims of negligent infliction of emotional distress are "the persons that the negligent conduct has directly affected." *Barnes v. Anyanwu*, 391 Fed.Appx. 549, 552 (7th Cir. 2010). "Illinois courts treat claims by direct victims of negligent infliction of emotional distress under the same approach used for standard negligence claims." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009) (citing 574 N.E.2d at 606). "In other words, a party advancing a negligent infliction of emotional distress claim must demonstrate a defendant's duty, as well as a breach that proximately caused the claimant an injury." *Id.* In addition, under Illinois law, "a direct victim of alleged negligent infliction of emotional distress must satisfy the 'impact' rule." *Id.* Under the impact rule, a direct victim may not recover ... unless the emotional distress

was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Id.* (citation and internal quotation marks omitted).

Defendants argue that LaRiviere's negligent infliction of emotional distress claim fails because she did not allege, let alone prove any evidence indicating that defendants owed her a duty as required and because there are simply no facts to support an alleged duty on the part of defendants. In opposition, LaRiviere, merely, reiterates her arguments she advanced in support of her IIED claim as follows: "Even if the aforementioned acts were not sufficiently egregious to support a claim for intentional infliction of emotional distress they are certainly sufficient to support a claim for negligent infliction of emotional distress. Therefore they are incorporated by reference as though fully set forth herein." (Doc. 111, p. 11). LaRiviere does not address defendants' arguments regarding duty which the Court finds telling. Illinois courts have not imposed a general duty on employers to avoid causing harm to potential employees through their hiring and firing decisions, so there is no basis for a negligence claim. *See Sommers v. Household Int'l, Inc.,* No. 98 C 4539, 1999 WL 1285858, at *9 (N.D.Ill. Dec. 30, 1999) (citing cases and holding that "[t]he harm cannot be the plaintiff's loss of his job, since people lose jobs every day, and it is such a normal occurrence that to place the burden on an employer to guard every employee against the stress accompanying the loss of a job would be just too great"). Thus, LaRiviere's NIED claim fails as a matter of law.

## Count VI – Breach of Contract

Defendants maintain that LaRiviere's claim for breach of contract fails as a matter of law because SIUE's non-appointment actions were in accordance with its established policy. Specifically, defendants maintain that LaRiviere's breach of contract claim is premised on a fundamental misinterpretation of SIUE's policies and procedures as they apply to individuals in administrative professional positions. In response, LaRiviere simply states with nothing more: "Defendants' policies and procedures entitle its protections to many rights commensurate to their responsibility and years of service. Plaintiff was neither an opportunity to retrain nor was she properly given one year's notice before her continuing appointment was to come to an end. There are clearly material facts in dispute regarding whether Defendant breached its contractual obligations to Plaintiff." Without any more, the Court is left to guess what the material facts in dispute are. The record is clear and LaRiviere did not dispute the fact that SIUE followed its published policies in its decision to provide her with one-year notice of non-appointment on May 5, 2016. Specifically, SIUE adhered to Section 2.18 Notice Requirements to the Non-Renewal of LaRiviere's continuing appointment. Thus, the Court finds that LaRiviere's breach of contract claim fails as a matter of law.

## Count VII – FMLA

The FMLA entitles eligible employees suffering from serious health conditions to twelve workweeks of leave during each twelve-month period. 29 U.S.C. § 2612(a)(1)(D). The FMLA also makes it unlawful for an employer to interfere with an employee's attempt to exercise FMLA rights or to retaliate against employees who exercise their FMLA rights. 29 U.S.C. § 2615. In order to prevail on a FMLA interference claim, an employee must establish that (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

Defendants do not dispute that LaRiviere was entitled to benefits under the FMLA as defendants approved LaRiviere's two different requests for FMLA leave after she received her one-year notice of non-reappointment. Thus, the Court need only decide whether defendants interfered with LaRiviere's FMLA leave by contacting her several times while she was on leave. In response to defendants arguments, LaRiviere merely states "[i]t is axiomatic that you don't disturb employees who are convalescing on FMLA leave."

Viewing the facts in the light most favorable to LaRiviere, the Court finds that LaRiviere's FMLA claim fails as a matter of law and that defendants did not interfere with her rights under the FMLA. Here, the record reflects that in her second round of FMLA leave in a year, Fuligni called LaRiviere at least three times, that Fuligni and LaRiviere spoke once on the phone, that Fuligni left her a voicemail

and that Fuligni wrote her a letter. These minimal contacts were to discuss the administrative steps to retrieve SIUE equipment and materials that LaRiviere may have had and to return LaRiviere's personal items remaining in her office as she was scheduled to be out of the office on FMLA until her scheduled last day of work, May 5, 2017. A few *de minimis* work related contacts with the employee while on FMLA is allowed under the FMLA. *See O'Donnell v. Passport Health Commination's, Inc.,* 561 Fed. Appx. 212, 216-18 (3rd Cir. 2014)(affirming summary judgment on interference claim because emails requesting paperwork were *"de minimis"* and "did not require O'Donnell to perform work to benefit the company and did not materially interfere with her leave"); *Callison v City of Philadelphia*, 430 F.3d 117 (3rd Cir. 2005); *Allen v. Butler County Commissioners*, 331 Fed. Appx 389 (6th Cir. 2009). The phone calls, voicemail and letter from Fuligni constitute modest, unburdensome and reasonable efforts to perform business that needed to be completed while LaRiviere was on FMLA leave and prior to her last day of work. *See Daugherty v. Wabash Ctr., Inc.,* 577 F.3d 747, 751 (7th Cir.2009) (employer's requests for keys and passwords were modest and would enable employer to operate without the employee); *Sabourin v. Univ. of Utah*, 676 F.3d 950, 961 (10th Cir. 2012). Based on the record, LaRiviere's FMLA claim too fails as a matter of law.

## Conclusion

Accordingly, the Court **GRANTS** defendants' motion for summary judgment (Doc. 49). The Court finds in favor of defendants and against plaintiff on plaintiffs' Fourth Amended Complaint. The Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same.

**IT IS SO ORDERED.**

Judge Herndon
2018.09.19 13:01:56
-05'00'

**United States District Judge**